UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| PATRICK SCOTT, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 08-357-GFVT |
| | ) | |
| V. | ) | |
| | ) | |
| DEERBROOK INSURANCE COMPANY, | ) | **MEMORANDUM OPINION** |
| | ) | **& ORDER** |
| Defendant. | ) | |
| | ) | |
| | ) | |

*** *** *** ***

This matter is before the Court on Defendant Deerbrook Insurance Company's Motion for Summary Judgment [R. 33] and Motion to Exclude Testimony of Hon. Michael McDonald About the Value of Scott's Claim [R. 34]. Plaintiff Patrick Scott has filed Responses [R. 35, 36] in opposition to both motions. Additionally, on May 12, 2010, the Court conducted a hearing on the motions. For the reasons set forth below, both motions are granted.

**I.**

In his Complaint, Scott states that this cause of action arises out of an October 2005 motor vehicle collision involving Scott and Michael R. Melton, whose vehicle was insured by Deerbrook. [R. 1, Attach. 1.] The accident occurred when Melton, who was driving his pickup truck northbound on U.S. Highway 27, lost control of his vehicle, causing the trailer he was hauling behind his truck to cross into the southbound lane and strike the vehicle driven by Scott. [*See* R. 33, Attach. 1 at 6.] As a result, Scott crossed into the northbound lane and collided with a vehicle driven by Robert Coffey. [*Id.*]

1

Both Scott and his passenger, Cecil Nevels, sustained injuries in the collision. Scott alleges that Deerbrook acted in bad faith in its handling of his claim. [R. 1, Attach. 1.] Specifically, Scott alleges that Deerbrook violated the Kentucky Unfair Claims Settlement Practices Act ("KUCSPA") by failing to effectuate a fair, prompt, and equitable settlement with Scott where its insured's liability for the collision was reasonably clear. [*Id.*] The record reveals that Deerbrook offered Scott $7,000 for his personal injury claim in September of 2006, ultimately paying him Melton's policy limits of $25,000 in May of 2008. Scott claims that he was forced to engage in protracted litigation to recover the policy limits to which he was entitled, and which he should have received without litigation. [*Id.*] Scott asks for damages, including compensation for physical pain and mental suffering, costs, attorney fees, and pre- and post-judgment interest. [*Id.*]

## II.

The Court first considers Deerbrook's motion in limine regarding the testimony of Scott's expert, Hon. Michael McDonald. Federal Rule of Evidence 702 governs the admission of expert testimony. Under the Rule,

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FRE 702. Essentially, Rule 702 sets forth a two part test for admitting expert testimony: (1) Is the expert qualified and the testimony reliable? and (2) Is the evidence relevant and helpful to the trier of fact? *See also United States v. Jones*, 107 F.3d 1147, 1156 (6th Cir. 1997). While the

case law interpreting this Rule contains a number of principles, the decision regarding expert testimony admissibility ultimately lies in a fact-intensive analysis that is particular to each circumstance and subject to the discretion of the trial court. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-51 (1999). The proponent of the expert testimony does, however, bear the burden of establishing its admissibility by a preponderance of the evidence. *See Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

In determining whether the proposed testimony is reliable, the Court must first assess the expert's qualifications. In its motion, Deerbrook acknowledges McDonald's "long and illustrious career in the Kentucky legal community." [R. 34, Attach. 1 at 2.] According to McDonald's Rule 26(a)(2) Report [*see* R. 25, Attach. 2], he worked as an insurance claims adjuster for three years before beginning the practice of law. He became a licensed attorney in the Commonwealth of Kentucky in 1963. [*Id.*] During his time in private practice, he represented insurance companies in the prosecution and defense of insurance claims, and he also represented individual plaintiffs in claims against insurance companies. [*Id.*] McDonald served as a Circuit Judge in Kentucky State Court from 1972 until 1980, when he was elected to the Kentucky Court of Appeals. He served on the Court of Appeals from 1980 to 1995. [*Id.*] While on the bench, McDonald adjudicated many cases involving insurance and insurance coverage, and since retiring from the bench he has mediated and arbitrated over a hundred cases involving disputed insurance claims. [*Id.*]

Deerbrook further acknowledges that, based on his experience, McDonald is qualified to render expert testimony on insurance claims handling generally. Deerbrook notes that McDonald has been qualified to testify as an expert on claims handling by several courts, and has even

3

testified on behalf of Deerbrook affiliate Allstate Insurance Company in the past. Deerbrook argues, however, that McDonald is not qualified to give an expert opinion on what it perceives to be one of the pivotal issues in this case–the value of Scott's personal injury claim before a Pulaski County jury in the late summer and fall of 2006.[1]

In *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994), the Sixth Circuit explained that "[t]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." Deerbrook has cited three cases in which a court has excluded the testimony of an expert witness not because he or she lacked experience or qualifications in the abstract, but because he or she appeared to lack expertise regarding the specific issue involved in the case. In *Trustees of Univ. of Pennsylvania v. Lexington Ins. Co.*, 815 F.2d 890, 903 (3d Cir. 1987), the

---

[1]Deerbrook relies on *Manchester Ins. & Indem. Co. v. Grundy*, 531 S.W.2d 493 (Ky. 1976), and *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437 (Ky. 1997), in suggesting that this is a pivotal issue. In *Grundy*, Kentucky's highest court did state as follows: "[T]wo expert witnesses . . . testified as to what amount they would consider the case worth for settlement purposes. This is irrelevant. The test of this factor is what in the opinion of the expert a jury in the same community probably would have awarded at the time of the trial on liability." 531 S.W.2d at 501. *See also Glass*, 996 S.W.2d at 446-47 (An expert "was permitted to express his opinion that the value of Jeffrey Glass's claim was between $90,000.00 and $1,250,000.00, although he admitted that he had no knowledge concerning jury verdicts in the community . . . This was in direct contravention of our holding in *Manchester* . . . ."). *Grundy*, however, involved a first-party bad faith claim. The court held that the standard for such a claim was whether the insurer's failure to settle exposed the insured to an unreasonable risk of having a judgment rendered against him in excess of his policy limits. *Grundy*, 531 S.W.2d at 501. The test for *this standard* is the value of the claim before a jury in the same community. *Id.*
   Scott's claim, in contrast, is a third-party bad faith claim. Since he is not Deerbrook's insured, his main concern was not a judgment in excess of the policy limits. His main concern, as expressed in his Complaint, was receiving a just settlement in a timely fashion. While an expert's opinion of the value of Scott's personal injury claim before a jury might be helpful in determining whether Deerbrook acted in bad faith by not settling for the policy limits sooner, it is not the only evidence a jury can and should consider, nor does it appear to be necessary evidence.

4

Third Circuit upheld the trial court's decision to exclude the opinions of a claims examiner regarding the value of a potential jury verdict and the claim's settlement value, finding that she "had several years experience as a claims adjuster, but she was not shown to have any experience with claims approaching the magnitude presented by this case." Similarly, in *Certain Underwrites at Lloyds, London v. Inlet Fisheries, Inc.*, 389 F. Supp. 2d 1145, 1152-54 (D. Alaska 2005), the court found that the proposed expert, despite forty-five years of experience in the insurance industry, was not qualified to testify with respect to underwriting marine pollution policies. And, again, in *Neri v. Nationwide Mut. Fire Ins. Co.*, 719 A.2d 1150, 1153 (R.I. 1998), the court found that the trial judge abused his discretion in permitting the plaintiff to testify as an expert on causation where his "experience included forty years in the construction industry, [but] his training and education in the technical aspects of truss design were minimal."

These cases highlight the concerns courts have had about qualifying witnesses as experts on the basis of work experience alone. *See United States v. Gallion*, 257 F.R.D. 141, 148 (E.D. Ky. 2009); *Cicero v. Borg-Warner Auto., Inc.,* 163 F. Supp. 2d 743 (E.D. Mich. 2001). As stated by the court in *Lippe v. Bairnco Corp.*, "an expert basing his opinion solely on experience must do more than aver conclusorily that his experience led to his opinion . . . ." 288 B.R. 678, 686 (S.D.N.Y. 2003) (citation and internal quotation marks omitted). "Rather, an expert who is relying 'solely . . . on experience . . . must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* (quoting Fed. R. Evid. 702 advisory committee's note (2000 Amendments)). According to the Supreme Court, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing

5

data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

During his deposition, McDonald indicated that he intends to testify that it is his belief that a reasonable jury in Pulaski County would have awarded Scott between $50,000 and $75,000, and possibly as much as $100,000 had his personal injury case gone to trial. [R. 36, Attach. 2 at 4-5.] He stated that he bases his opinion on his knowledge of the facts of the case, his review of the trial court reporter, his knowledge of Pulaski County and the Pulaski County venire, and his personal experience. [*Id.* at 3-4.] He referred to Pulaski County as "middle of the road," neither liberal or conservative. [*Id.* at 6-7.]

Significantly, however, McDonald testified that he never conducted any research on jury verdicts in Pulaski County. [*Id.* at 3.] He further testified that he never presided over any jury trials in Pulaski County as a trial judge, and that it's possible he never mediated any personal injury cases in Pulaski County. [*Id.* at 3, 8.] McDonald could recall assisting another attorney in a trial in Pulaski County only once during his time in private practice. [R. 34, Attach. 2 at 5.] And although he could recall sitting for oral argument week in Pulaski County twice during his time on the Court of Appeals, McDonald could not recall whether any of the cases were Pulaski County personal injury cases. [*Id.* at 14.]

Ultimately, the Court agrees with the Defendant that McDonald is not qualified to testify regarding the value of Scott's claim before a Pulaski County jury. McDonald has stated that his experience teaches him that Pulaski County is a "middle of the road" county. That opinion is perhaps bolstered by the deposition testimony of attorney Ed Henry, who represented

6

Deerbrook's insured and has stated that Pulaski County is neither liberal nor conservative, but rather an "average" county. McDonald, however, has not explained how his opinion that Pulaski County is "middle of the road" led him to reach the conclusion that a reasonable jury would have awarded Scott between $50,000 and $75,000, and possibly up to $100,000. Nor has he explained how his review of Scott's case file and his own experiences with insurance cases led him to those values. Without more experience with, and/or research regarding, Pulaski County juries and personal injury jury verdicts in the relevant time period, the gap between McDonald's data and his opinion is simply too great.[2] *See General Elec. Co.*, 522 U.S. at 146.

Because McDonald's opinion regarding the value of Scott's personal injury claim before a Pulaski County jury is inadmissible, the Court need not consider it in the context of Deerbrook's Motion for Summary Judgment.[3] *See Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994); *Beyene v. Coleman Sec. Services, Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988). As noted by Scott, however, by conceding that McDonald is qualified to testify regarding claims

---

[2] At the hearing on Deerbrook's pending motions held May 12, 2010, Scott's counsel argued that McDonald could be asked to render his opinion regarding the value of Scott's claim before a Pulaski County jury based on the assumption from other evidence in the record, specifically Ed Henry's deposition testimony, that Pulaski County is a moderate or average county. For the reasons stated above, however, that argument fails. A question based on such an assumption does not cure the lack of explanation from McDonald regarding how the fact that Pulaski County is an average county led him to opine that a jury would likely award $50,000 to $75,000 in Scott's case, especially since it appears that McDonald has performed little research on average jury verdicts across the state.

[3] The Court notes, however, that even if it did consider this specific opinion, its decision to grant summary judgment in favor of Deerbrook would not change. Under the particular standards to be applied and facts in the record in this case, which are fully discussed below, even if this opinion was admitted, the Court still could not find that Scott has raised a genuine issue of material fact regarding whether Deerbrook acted in bad faith by failing to offer the policy limits sooner.

handling practices generally, Deerbrook appears to concede that he can testify that it is his opinion that it was Deerbrook's intent to make a lowball offer in this case and delay settlement until a looming trial, among other opinions related to claims handling. Therefore, the Court will address McDonald's other opinions in the context of summary judgment.

### III.

### A.

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corporation of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated otherwise, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. In reviewing a motion for summary judgment, the court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Browning v. Dept. of Army*, 436 F.3d 692, 695 (6th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 495 U.S. 574, 587 (1986)).

### B.

The KUCSPA sets forth several unfair claims settlement practices that constitute violations under the Act. *See* KRS 304.12-230(1)-(17). For example, under the KUCSPA, it is

8

an unfair claims settlement practice for anyone to fail to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies or to refuse to pay claims without conducting a reasonable investigation based upon all available information. KRS 304.12-230(3) & (4). Here, the provision of the KUCSPA at issue is KRS 304.12-230(6), which makes it a violation for an insurer to fail to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim in which liability has become reasonably clear. [*See* R. 35 at 17.]

Generally, in order to prevail on a KUCSPA claim for bad faith, a plaintiff must show: (1) that the insurer was obligated to pay the claim under the terms of the policy; (2) that the insurer lacked a reasonable basis in law or fact for denying the claim; and (3) that the insurer knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed. *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993). Additionally, "before a cause of action for violation of the UCSPA exists, there must be evidence sufficient to warrant punitive damages." *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 448 (Ky. 1997) (citing *Wittmer*, 864 S.W.2d at 890). Punitive damages are warranted where there is "proof of bad faith sufficient for the jury to conclude that there was conduct that was outrageous, because of the defendant's evil motive, or his reckless indifference to the rights of others." *Id.* at 452.

With respect to KUCSPA claims predicated on delay, "mere delay in payment does not amount to outrageous conduct absent some affirmative act of harassment or deception. In other words, there must be proof or evidence supporting a reasonable inference that the purpose of the delay was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage." *Id.* at 452-53. Or, as stated in *United Services Auto Ass'n v. Bult*, 183

9

S.W.3d 181, 186 (Ky. App. 2003), "Evidence of mere negligence or failure to pay a claim in timely fashion will not suffice to support a claim for bad faith . . . [I]nstead, the element of malice or flagrant malfeasance must be shown." *See also Mann v. Hartford*, 2005 WL 1993441, at *5 (6th Cir. Aug. 18, 2005).

In its motion for summary judgment, Deerbrook argues that Scott cannot satisfy the stringent standards discussed above. First, Deerbrook argues that Scott cannot meet the second prong of the *Wittmer* test, as he cannot show that Deerbrook lacked a reasonable basis in law or fact for not paying him $25,000 in August 2006. Deerbrook contends that it had a reasonable basis to initially question whether the accident involving its insured caused Scott's injuries. According to Deerbrook, with the exception of an injury to his thumb, all of Scott's treatment after the 2005 collision appeared to be for pre-existing conditions related to a previous car accident. Deerbrook further contends that it had a reasonable basis for offering its policy limits to Scott in May of 2008, as it did not receive documented proof that Scott's tremors increased as a result of the 2005 collision until May of 2008.

Second, Deerbrook argues that Scott cannot establish that Deerbrook's conduct justifies the imposition of punitive damages. Deerbrook states that the facts do not demonstrate any undue delay on its part. Further, Deerbrook claims that the record is devoid of evidence that the purpose of any delay was to extort a more favorable settlement from Scott, and it claims that its $7,000 offer in August 2006 was reasonable based on the information provided.

The record in this case reveals that Scott was involved in a prior car accident in Indiana in 1985. Scott suffered severe injuries in this accident, including a closed head injury and a crushed pelvis. [R. 33, Attach. 3 at 7.] He was hospitalized for three months and in a coma for fifty-

eight days. [R. 33, Attach. 2 at 5, 12.] His treating physicians included a surgical neurologist. [R. 33, Attach. 3 at 7.] As a result of his injuries, Scott has been declared disabled by the Social Security Administration. [R. 33, Attach. 2 at 2.] Indeed, as late of March of 2005, seven months before the accident with Melton, Scott's physician noted that Scott suffered from low back and hip pain and occasional memory loss stemming from the 1985 accident. [R. 33, Attach. 4 at 47-8.]

The accident involving Scott and Deerbrook's insured occurred on October 21, 2005. After the accident, Scott was treated at the ER for thumb and hip pain. [R. 33, Attach. 4 at 14.] Later, Scott's thumb was placed in a cast and he went to occupational therapy for his thumb injury. [R. 33, Attach. 4 at 24, 25.] Additionally, Scott began experiencing headaches after the 2005 accident similar to headaches he had experienced in the past. [R. 33, Attach. 4 at 16.] Dr. Cherry believed these headaches may have been caused by a whiplash injury and ordered an MRI. [*Id.*] Later medical records reveal that Scott's headaches got better, and his whiplash injury was considered resolved. [R. 33, Attach. 4 at 22.]

At some point, Dr. Cherry referred Scott to Dr. Andrew Schneider, a neurologist, because he was experiencing intermittent tremors or seizures. [R. 33, Attach. 4 at 33-35.] In a letter to Dr. Cherry, Dr. Schneider explained that subsequent to the 1985 accident, Scott "had problems with 'uncontrolled shaking' of the right arm and hand . . . He had a workup including continuous EEG in Indiana, and was diagnosed with non-epileptic seizure, according to his wife. The right sided tremor never really went away, but in recent months and years has not been as bad as it was in the past, apparently." [R. 33, Attach. 4 at 33.] Within one to two months of the 2005 accident, however, Scott began having "unusual symptoms" that his wife described as a "whole

11

body tremor." [*Id.*] Dr. Schneider notes that he was "not sure what to make of this symptom. An epileptic phenomenon is possible. Given the patient's own description of his symptoms, this may represent a manifestation of anxiety or a post-traumatic state." [*Id.* at 34.] Dr. Schneider stated that he would try to arrange for an EEG, and he also stated that he was going to request records from the neurologist in Indiana who had examined Scott in the past. [*Id.*]

Scott hired an attorney to represent him on October 28, 2005. [R. 39, Attach. 1 at 5.] Scott sent a demand, or settlement, package to Deerbrook in August of 2006.[4] Deerbrook responded in September of 2006 with an offer to settle the claim for $7,000. [*See* R. 33, Attach. 3 at 4.] At the hearing on the summary judgment motion, Deerbrook's counsel explained that this $7,000 was offered to compensate Scott for his pain and suffering, as Scott's Personal Injury Protection ("PIP") benefits had paid all of this medical bills up to that point, and Scott had not yet made a claim for future medicals. Deerbrook would have been liable for the PIP lien in addition to the $7,000 it paid to Scott.[5]

In a letter to Deerbrook dated November 18, 2006, Scott's counsel stated that he did not understand why Deerbrook had not tendered the policy limits of $25,000, and he further stated that he was enclosing copies of complaints he intended to file in state court against Melton, Deerbrook's insured, that week. [R. 33, Attach. 3 at 6.] This letter was stamped received by Deerbrook on November 27, 2006. [*Id.*] On November 20, 2006, Scott filed suit against Melton

---

[4]Scott does not contend that Deerbrook violated any duties prior to its August 2006 receipt of the demand package. According to Scott, without the demand package, Deerbrook did not have the necessary damages information with which to evaluate Scott's claim. [R. 35 at 17.]

[5]Once Scott received the policy limits, however, Deerbrook was no longer liable for the PIP lien.

in Pulaski Circuit Court. [R. 35, Attach. 2 at 8.]

Although Deerbrook assessed Melton's liability for the accident at one hundred percent (100%) from the beginning, Melton gave information to Edward Henry, the attorney representing him in the state court action, suggesting that he was not liable, specifically, that an unknown vehicle pulled in front of him causing the accident. [*See* R. 33, Attach. 10 at 4-5.] Accordingly, Henry sought to interview Robert Coffey, who had also been a victim of the accident, to see if he had seen this "phantom" car. [*Id.* at 20-21.] Henry took Coffey's deposition on January 8, 2008. [*See* R. 33, Attach. 11.] In a letter to Deerbrook claims adjuster Tom Kyle, Henry explained that Coffey is a long-haul truck driver who had not been responsive previously because he had "always been on the road." [*Id.*] In the same letter, Henry stated that Coffey testified "very strongly" against Melton's interest in the case. [*Id.*] Specifically, Coffey testified that the accident was caused by Melton's overloaded trailer, which was weaving significantly and eventually crossed the center line, striking Scott's truck. [*Id.*]

Additionally, during the course of the litigation, on January 23, 2008, Dr. Schneider's deposition was taken. In response to questions from Scott's counsel, Dr. Schneider testified that after he performed an EEG study in August of 2007, he determined that Scott's tremors or shaking "spells" were not epileptic seizures, but were instead psychological events. [R. 33, Attach. 8 at 2.] Specifically, Dr. Schneider stated that they were post-traumatic reactions to the 1985 and 2005 car accidents. [*Id.* at 3.] Henry's questioning of Dr. Schneider reveals that he did not have a copy of the report from the August 2007 EEG study. [*Id.* at 4.] Henry, and therefore Deerbrook, only had treatment records from Dr. Schneider up to July of 2007. [*Id.*] Henry asked for a copy of the report and reserved his cross-examination of Dr. Schneider for a later date. [*Id.*

at 5.] In a later deposition taken September 16, 2009, for purposes of this case, Dr. Schneider testified that the 2005 accident caused Scott's shaking episodes to increase. [R. 33, Attach. 9 at 5.] He further confirmed that he had not diagnosed what was causing Scott's tremors as of July of 2007. [*Id.*]

Before he could obtain new treatment records from Dr. Schneider, Henry needed an updated medical authorization from Scott. It appears that Henry emailed the relevant records to Tom Kyle at Deerbrook on or about May 1, 2008. [*See* R. 33, Attach. 4 at 69.] Thus, it was not until January of 2008 that Deerbrook knew that there was a diagnosed link between Scott's tremors and the 2005 accident, and it was not until May of 2008 that Deerbrook received documentary evidence of that link. Deerbrook offered Scott the policy limits of $25,000 at a scheduled mediation on May 28, 2008.

Upon review of this record, it appears likely that Deerbrook had a reasonable basis for offering Scott $7,000 in September of 2006. *See Wittmer*, 864 S.W.2d at 890. At that time, it could have reasonably appeared to Deerbrook that Scott had suffered only an injury to his thumb, hip pain, and a whiplash injury as a result of his accident with Deerbrook's insured. Ultimately, however, the Court need not decide this issue, as it finds that there is no evidence that would justify an award of punitive damages in this case. *See Glass*, 996 S.W.2d at 448. Accordingly, summary judgment in favor of Deerbrook must be granted.

As stated previously, in order to warrant punitive damages in a KUCSPA case, there must be evidence the defendant acted outrageously, with an evil motive or with reckless indifference to the plaintiff's rights, and mere delay in payment does not constitute outrageous conduct absent some affirmative act evidencing that the delay was for an improper purpose. *Glass*, 996 S.W.2d

at 452-53. Scott contends that Deerbrook's own policies and procedures serve as evidence of its evil motive, and he advances two main arguments in support of this position. First, Scott argues that Deerbrook had a policy of deterring third party claimants from hiring attorneys, and he states that attorney-represented claimants achieve settlements two to three times that of unrepresented claimants.

The record in this case includes a "Customer Service Pledge" that Deerbrook claims representatives were purportedly supposed to give to third party claimants. [*See* R. 35, Attach. 3 at 5.] This pledge includes a promise to conduct a quick and fair investigation of the facts of the case. [*Id.*] The pledge itself, however, makes no mention of attorneys or attorney representation. Instead, another sheet, headed "Do I Need An Attorney?," appears to provide guidance for handling questions from claimants about attorneys. [*Id.* at 6.]

The claim diary in this case suggests that a "pledge" was given to Scott's wife, Karen, over the phone. [R. 35, Attach. 2 at 21.] Of course, that does not necessarily mean that attorney representation was discussed with her at all. Moreover, at their depositions, both Scott and his wife indicated that they hired an attorney to represent Scott about one week after the 2005 accident, and they stated that this was not because of anything Deerbrook had done. [R. 33, Attach. 5 at 6; R. 39, Attach. 1 at 5.] Indeed, Scott's wife stated that they did not even know who Melton's insurer was at that time. [R. 39, Attach. 1 at 5.] Thus, Scott's argument that Deerbrook's evil motive is evidenced by its policy of deterring claimants from hiring attorneys must fail, as Scott has not shown the requisite nexus or link between any such policy and any specific harm suffered by him. See *Kentucky Farm Bureau Mut. Ins. Co. v. Rodgers*, 179 S.W.3d 815, 819 (Ky. 2005); *State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 422

(2003). *See also Cardiner v. Provident Life & Accident Ins. Co.*, 158 F. Supp. 2d 1088, 1106 (C.D. Cal. 2001) ("Plaintiff fails to establish any link between Provident's actions with respect to this specific claim and the alleged plan attributed to Provident. For example, Plaintiff fails to show how the 'practice' of denying claims affected and influenced the denial of his specific claim in particular.").

Second, Scott argues that it was Deerbrook's practice to make a low ball settlement offer, forcing claimants to litigate in order to get a good faith offer, because Deerbrook's policy and procedures discourage a re-evaluation until a mediation or trial date is looming. Essentially then, Scott argues that Deerbrook made a low offer in bad faith in September of 2006 and did not change that offer until May of 2008 in an attempt to extort a more favorable settlement. In support of this argument, Scott notes that claims adjuster Tom Kyle's compensation package is performance based, and one criteria for judging his performance is the percentage of claims that are re-evaluated. Deerbrook set a goal that Kyle limit his re-evaluations to 13.5% of cases. Scott also submits the expert report of McDonald, who states his opinion that "Deerbrook's claims process evidenced an intent to make an initial low ball offer and never change that offer until court ordered mediation or a trial day approached." [R. 25, Attach. 2 at 7.] According to McDonald, "There was no excuse for Deerbrook to treat Patrick Scott as it did except for the reasons of an evil motive or a reckless disregard for his rights as a third party claimant." [*Id.* at 6.]

As a preliminary matter, the Court notes that the existence of an expert witness does not necessarily defeat a motion for summary judgment. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 543 (6th Cir. 1999); *Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 595 (E.D. Pa.

16

1999). In order to raise a genuine issue of material fact for trial, "an expert opinion must be more than a conclusory assertion about ultimate legal issues." *Williams*, 187 F.3d at 543 (citation and internal quotation marks omitted). Further, an expert's opinion must be validated by sufficient facts in the record. *Kosierowski*, 51 F. Supp. 2d at 595 (citing *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1198-99 (3d Cir. 1995)). *See United States Automobile Ass'n v. Bult*, 183 S.W.3d 181, 186 (Ky. App. 2006) (holding that the trial court erred in failing to grant the defendant's motion for a directed verdict based on an absence of sufficient evidence to support a claim for bad faith, even though the plaintiff had four expert witnesses, including McDonald, testify on his behalf at trial). Here, like Scott's arguments, McDonald's opinions are not supported by sufficient facts in the record.

While Scott alleges that it was Deerbrook's general practice to make a low initial offer in bad faith and not change that offer until an imminently approaching trial or mediation, under the particular facts of this case there is insufficient evidence to support a reasonable inference that Deerbrook's purpose in failing to offer Scott the policy limits until May of 2008 was to extort a more favorable settlement. *See Rodgers*, 179 S.W.3d at 819; *Campbell*, 538 U.S. at 422; *Cardiner*, 158 F. Supp. 2d at 1106. At his deposition, claims adjuster Kyle testified that re-evaluations can occur if additional information is received or if things change about the claim. [R. 35, Attach. 1 at 36.] He further stated that in order to meet the goal of limiting re-evaluations to 13.5% of cases, he tries to make sure he has all the information before evaluating a claim. [*Id.* at 37.] In Scott's case, however, the record reveals that Deerbrook did not have all the relevant information from Scott before it evaluated his claim and made the initial $7,000 offer. Significantly, Deerbrook did not know that as a result of an EEG study performed in August

17

2007, Dr. Schneider determined that the 2005 accident caused Scott's tremors to increase. Deerbrook did not receive Dr. Schneider's report until May of 2008. Before then, it knew only that Dr. Schneider had noted that he did not know what was causing Scott's seizure-like activity, and he speculated that it *may* have been a psychological anxiety-driven response to the accident. Deerbrook's records suggest its belief, prior to receiving Dr. Schneider's report, that Scott's tremors were the result of his pre-existing head injury.[6] [*See* R. 35, Attach. 2 at 28; R. 33, Attach. 4 at 53.]

Promptly after receiving Dr. Schneider's report, Deerbrook extended settlement authority to $25,000, the policy limits, on Scott's case. While the policy limits offer was made at a scheduled mediation, there is nothing in the record to suggest that Deerbrook would not have re-evaluated Scott's claim and made a policy limits offer sooner had it received a copy of Dr. Schneider's report at an earlier time.

Scott and McDonald suggest that the fact that Deerbrook considered its insured to be one hundred percent at fault for the 2005 accident before, during, and throughout the litigation serves as evidence of its bad faith in not settling for the policy limits sooner. [*See* R. 33, Attach. 3 at 6.] As pointed out by Kyle, however, in assessing liability against its insured at one hundred percent, Deerbrook meant liability for the accident itself, not necessarily liability for all the injuries Scott claimed he suffered as a result of the accident. [R. 35, Attach. 1 at 41.]

Scott and his expert also contend that the actions of Melton's attorney, Henry, in raising lack of liability as an affirmative defense during the state court litigation, evidence bad faith on

---

[6]For example, the Negotiation Plan in this case reflects Deerbrook's belief as of August 25, 2006, that Scott's extensive prior history was likely the cause of his cognitive problems. [R. 35, Attach. 2 at 28.]

the part of Deerbrook. Based on Melton's statements to Henry that an unknown vehicle pulled out in front of him causing the accident, however, it appears that Henry had a good faith basis for making that affirmative defense. Moreover, while an insurer's duties under the KUCSPA apply both before and after litigation has commenced, an insurer's post-filing litigation tactics, in contrast to its post-filing settlement behavior, are not admissible to prove bad faith. *See Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512 (Ky. 2006).

Additionally, Scott and McDonald argue that Deerbrook improperly manipulated its evaluation tools in evaluating Scott's claim. Specifically, they point to Deerbrook's use of Colossus, a computer program that determines a settlement range for a claim based on various variables entered into the program by Deerbrook employees, and Deerbrook's setting of its reserves for Scott's case. These arguments, however, rely on the fact that Deerbrook had all of the information it needed to evaluate Scott's claim in August of 2006. As explained previously, the record does not support that fact, as Deerbrook had no evidence of a diagnosed link between Scott's tremors and the 2005 accident at that time. Further, even if Deerbrook made errors using Colossus and setting its reserves, Scott has offered no evidence that such errors were the result of anything more than negligence. And negligence is not enough to support an award of punitive damages under the KUCSPA. *See Mann v. Hartford*, 2005 WL 1993441, at *5. *See also Glass*, 996 S.W.2d at 454 (an incorrect evaluation is not "outrageous conduct").

In sum, under the facts of this case, no reasonable jury could find that any delay in offering Scott the policy limits resulted from any action on the part of Deerbrook that amounted to outrageous conduct based on an evil motive or reckless indifference to Scott's rights. There is simply no evidence in the record justifying the imposition of punitive damages. Summary

19

judgment is therefore granted in favor of Deerbrook.

## IV.

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. Deerbrook's Motion in Limine to Exclude Testimony of Hon. Michael McDonald About the Value of Scott's Claim [R. 34] is **GRANTED**;

2. Deerbrook's Motion for Summary Judgment [R. 33] is **GRANTED**;

3. Judgment in favor of Deerbrook is entered contemporaneously herewith; and

4. This is a final and appealable order.

This the 20th day of May, 2010.

Signed By:
*Gregory F. Van Tatenhove*
United States District Judge